UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

FAITH SAMUELS,

               Plaintiff,                        Case No. 16-cv-10890

v.                                       Paul D. Borman
                                       United States District Judge

ALLSTATE PROPERTY              David R. Grand
& CASUALTY INSURANCE      United States Magistrate Judge
COMPANY, a foreign corporation,

               Defendant.
_____/

## OPINION AND ORDER (1) DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (ECF NO. 27), (2) DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ECF NO. 29), AND (3) DENYING DEFENDANT'S MOTION TO EXCLUDE TESTIMONY OF PLAINTIFF'S EXPERT, RAYMOND FAIR (ECF NO. 28)

This is an insurance loss case. Plaintiff claims to have suffered damage to her home as a result of water damage, allegedly caused by burst frozen pipes, and seeks to recovery under a policy of insurance issued by Defendant Allstate Property & Casualty Insurance Co. ("Allstate"). Allstate has denied coverage under the Policy's fraud provision. Both parties have filed motions for summary judgment (ECF Nos. 27, 29) and filed respective Responses (ECF Nos. 36, 35) and Allstate filed a Reply (ECF No. 37). Allstate has also filed a motion to exclude Plaintiff's expert, Raymond

Fair (ECF No. 28), to which Plaintiff has responded (ECF No. 32) and Allstate has replied (ECF No. 33). The Court held a hearing on all three motions on February 14, 2018. For the reasons that follow, the Court DENIES all three motions.

## I.    FACTUAL BACKGROUND

### A.    Plaintiff's Previous Claims and Allstate's Investigation of the February 2015 Loss

Plaintiff Faith Samuels came to the United States from Jamaica in 1999 and lost her husband in a car accident in or about 2008. Plaintiff received approximately $200,000 in life insurance proceeds in connection with his death. Her adult son, Ackeem Dehaney, received approximately $100,000. Ms. Samuels utilized a good portion of these funds to purchase five or six income producing rental properties in the Detroit area which she has managed/lived in and/or sold over the past ten years. (ECF No. 36, Def.'s Resp. to Pl.'s Mot. Summ. J. Ex. 1, May 3, 2017 Deposition of Faith Samuels 7:16-23, 13:3-20:13, 143:10-144:14; Ex. 4, July 28, 2015 Examination Under Oath ("EUO") of Faith Samuels 20:12-17.)

In August, 2013, Plaintiff sustained a fire loss at one of her rental properties and filed a claim with Allstate, which Allstate paid. (EUO of Faith Samuels 12:20-13:5.) In April, 2014, Plaintiff filed another claim with Allstate, this time for water damage caused by a burst pipe in Plaintiff's boiler heating system at the property where

Plaintiff resides, 17151 Annchester Road, Detroit, Michigan 48219, the same Property that is the subject of the loss at issue in this action. (Pl.'s Dep. 52:19-53:6.) With respect to that April 16, 2014 water damage incident, Plaintiff explained that in the space of a week she noticed that water was dripping from the boiler in the basement and from a radiator in one of the bedrooms and that the boiler was not heating the home. (Pl.'s Dep. 56:13-58:1.) Plaintiff then purchased some space heaters to heat the home: "I buy space heater when that happened with that, with the water running, and then I wasn't getting any heat from the furnace, I don't know why I didn't get heat from the furnace." (Pl.'s Dep. 59:17-20.) Ultimately, and the event that caused Plaintiff to finally file a claim with Allstate, according to Plaintiff something burst in the wall behind the radiator in the living room causing damage to the drywall. (Pl.'s Dep. 53:7-54:6.) Plaintiff's friend, Mr. Bilroy Nicholas, patched the wall in Plaintiff's living room that was damaged as a result of the April 16, 2014 water incident free of charge. (Pl.'s Dep. 127:22-128:9; ECF No. 35, Pl.'s Resp. To Def.'s Mot. Summ. J. Ex. 7, Bilroy Nicholas Dep. I 17:6-20-18:10.)

On May 1, 2014, Allstate denied Plaintiff's claim "for the loss that occurred on April 16, 2014." (Def.'s Resp. to Pl.'s Mot. Summ. J. Ex. 3, May 1, 2014 Denial Letter.) In sum, Allstate based its denial on Policy provisions that exclude coverage for "lack of maintenance" – damage caused by seepage or leakage from plumbing or

heating fixtures that is of a sustained nature, i.e. occurring over a period of weeks, months, or years. (*Id.*) Allstate engaged an engineer from Donan Engineering, Chad Peterson, to conduct a study of the Annchester Road property ("the Property") to determine the cause of the boiler failure and water damage. Mr. Peterson conducted his study on May 20, 2014 and issued his Report on June 3, 2014. (Def.'s Mot. Summ. J. Ex. 2, June 3, 2014 Report of Chad E. Peterson.) Mr. Peterson made the following observations, as relevant here, following his study of the Property:

> Water-damaged plaster is evident in the northeast corner of the living room where the radiator's relief valve was venting steam. Water damage was observed near the southeast corner of the living room's ceiling. The water damage to the ceiling is due to the freezing and rupturing of water lines going to the second-floor master bedroom's radiator . . . . No damage was evident in the radiator.

> Water damage is evident on the north wall and ceiling of the dining room . . . the result of the freezing and rupturing of water lines going to the radiator of the second-floor, northwest bedroom . . . . The radiator has no apparent damage. Ms. Samuels pointed out damage to the floor around a radiator that is located on the second-floor, southeast bedroom. The floor damage is the result of a long-term leak around the radiator and is not the result of freeze damage.

> The boiler is located in the basement . . . . Water was evident on the floor of the basement beneath a corroded boiler pipe. Water was dripping from the deteriorated steel pipe. The pipe is deteriorated due to long-term corrosion.

(June 3, 2014 Peterson Report 1-2.)

Mr. Peterson concluded that "the corrosion of the boiler pipe in the basement

likely caused a decrease in the water volume in the system that caused the system to overheat." (June 3, 2014 Peterson Report 3.) Mr. Peterson further concluded that "[t]he corrosion of the pipe is due to a lack of maintenance." (*Id*.) "When the system overheated, the relief valve in the living room vented the steam and damaged the wall. Ms. Samuels then turned the boiler system off and used a few space heaters to keep the house warm. . . . The water that remained in the boiler pipes above the living room and dining room froze, expanded, and caused the pipes to break and water to the ceilings and wall. The water in the pipes froze because the space heaters were not keeping the house warm enough." (*Id*.)

Plaintiff testified at her EUO that she understood Allstate denied her May 2014 claim due to long term issues with boiler and lack of maintenance of pre-existing conditions. (Pl.'s EUO 73:11-74:8.) There is no evidence in the record that Plaintiff contested Allstate's May 1, 2014 denial of her claim for the loss that allegedly occurred on April 16, 2014. In fact, Plaintiff claims that after Allstate denied the claim in May 2014, she had someone come to inspect and repair the issues that had been identified with the boiler. Plaintiff recalled that she was told that there was a corroded pipe that was leaking in the basement and that she had "Lonnie" come and replace the corroded pipe. (Pl.'s EUO 82:17-84:13.) In support of her statement that "Lonnie" came and "fixed" the broken leaking pipe, Plaintiff offered an invoice from

"Strickly H/C," which Plaintiff explained was "Lonnie's" company, dated May 5, 2014, that indicated "Lonnie" performed the following services: "Clean inspected boiler and repaired radiators. System is operating ok." (Def.'s Resp. to Pl.'s Mot. Summ. J. Ex. 7, May 5, 2014 Invoice from Strickly H/C.)  The invoice, which is stamped "PAID," notes an amount charged for the services of $250, but does not indicate if the charge included parts and labor or even if any parts were provided. (*Id*.)  Specifically, Plaintiff testified as follows regarding the alleged May 5, 2014 repair by Lonnie:

Q:      Was your [April 2014] claim denied for long-term leaking from the radiators?

A:      That's what they told me.

Q:      And was the, did they also tell you that there was a corroded pipe in the boiler and that was badly leaking during the 2014 loss, that that's what caused the problem, do you know?

A:      No, I don't know.

Q:      About a corroded pipe in the boiler that was badly leaking during the 2014 loss?

A:      I thought he told me – okay. Okay.

Q:      You got to let me finish. Do you know that or no?

A:      I don't remember but I know it was leaking.

Q:      The corroded pipe in the boiler was leaking?

A:      Yes.  And water was leaking on the floor so the guy came in and fixed it and that, that's what you have.

                    *              *              *

Q:      And who was that [guy who fixed it]?

                    A:      Lonnie.

Q:      Lonnie?

A:      Yeah.

Q:      Is that the invoice that [May 5, 2014 invoice from Strickly H/C] we marked as Exhibit 2?

A:      Yes, that's it.

Q:      Because it doesn't say that and that's why I'm asking if he fixed the corroded pipe in the boiler, whether it was replaced because it just said cleaned and inspected and repaired radiator.  You don't know – did he tell you that [he fixed the corroded pipe]?

A:      He said when he finished and everything is done, you see the water used to run out of the boiler and the ground so when he's finished and there's no more water running on the ground.  Water used to run.

Q:      Okay.  What, what I'm asking is did he fix that corroded pipe, did he replace that pipe?

A:      Yes, he did.

(Pl.'s EUO 82:17-84:13.)

Plaintiff testified that when she first reported to Allstate that the boiler had been repaired, she stated that an individual named Clarence had done the repair.  She

7

corrected herself at her EUO, explaining that when she went to look for the receipt for the work as requested by Allstate, she discovered the May 5, 2014 receipt from Strickly H/C and remembered that Lonnie, not Clarence, had done the work. Plaintiff confirmed that the only evidence she has to substantiate her claim that she did have the boiler repaired after Allstate denied her claim in May 2014 because of improper maintenance, is the May 5, 2014 receipt from Lonnie. (Pl.'s EUO 93:14-95:5.)

Lonnie Mitchell of Strickly H/C testified that he was at the Property in November or December 2013, when he was called by Plaintiff to service her boiler. (Def.'s Resp. to Pl.'s Mot. Summ. J. Ex. 18, July 25, 2017 Deposition of Lonnie Dennell Mitchell 25:7-26:12.) Mr. Mitchell testified that he recalled going to Plaintiff's home in the winter, when it was cold outside, and repaired the boiler. He recalled that Plaintiff called him sometime later to get a copy of the invoice for the work he had performed. When questioned about the May 5, 2014 invoice from Strickly H/C on which Plaintiff relies to substantiate her claim that she had her boiler repaired *after* Allstate denied her claim on May 1, 2014, Mr. Mitchell testified:

> Q: Is that the date that you prepared or generated or typed [the May 5, 2014 receipt]?
>
> A: I would say that's when I generated because I believe she didn't have her invoice, that's what it was, she didn't have her invoice and she needed an invoice and I sent that to her.

8

\*　　　　\*　　　　\*

Q:　So after you did the work on the boiler [in November or December 2013] you were contacted by Ms. Samuels and asked for the invoice again.

A:　Yes, that is right.

Q:　And she told you she couldn't find it.

A:　Correct.

Q:　When you had originally done the work for Ms. Samuels for the boiler you would have e-mailed her the invoice; is that what your practice would have been?

A:　Or I would have gave her a hand receipt because it was cash. Because when I do cash transaction, right up front I give a hand receipt.

\*　　　　\*　　　　\*

Q:　So you hand-wrote a receipt for Ms. Samuels that just would have said that she paid you $250?

A:　Yes, with her address and she signed off for whatever the services are.

Q:　And that occurred in the winter, November or December?

A:　Yes, it was the winter.

Q:　So if [the invoice] is dated May 5, 2014, then the November or December would have been 2013 because it would have been the prior November or December?

A:　Yes.

Q:     So, then Ms. Samuels called you in May 2014 and asked for a copy of an invoice because she couldn't find one.

A:     Correct.

                    *              *              *

Q:     So just to put a real fine point on it, in May 2014 you were not at Ms. Samuels' home and did not perform work at the home, right?

A:     Right.

                    *              *              *

Q:     You were there in November or December of 2013 at the Annchester Road property, right?

A:     Yes.

Q:     You were not there in May, 2014, correct?

A:     Not performing any work.

Q:     Were you there for some other reason in May 2014 at Ms. Samuels' home?

A:     No.

                    *              *              *

Q:     One thing you do know is you weren't there in May 2014, right?

A:     All I know is I fixed her boiler and it was working, that's it.

Q:     And you didn't do that in May 2014, did you?

A:     You've got to think in May of 2014, let's just be realistic, do you

use your heat?

Q:     It doesn't matter. Were you there in May 2014?

A:     No. I'm saying nobody use their heat in May.

Q:     So you wouldn't have been there in May?

A:     No.

(Mitchell Dep. 51:4-25, 54:2-20, 62:11-19, 78:1-11.)

On February 11, 2015, DTE was called to the Property to investigate Plaintiff's suspicion of a gas leak in the home.  (Def.'s Resp. to Pl.'s Mot. Summ. J. Ex. 10, Sept. 18, 2017 Deposition of Maurice Wilson 11:4-16.)  Plaintiff reported to Mr. Wilson when he arrived at the Property that the boiler had been off for a couple of days and she thought she smelled gas – it was February and it was cold outside:

Q:     [A]fter she had told me that it had been off for two days, her boiler had not worked in two days, my thing was to turn it off, make it safe . . . .

A:     So Ms. Samuels told you on February 11, 2015 that – I want to get this straight – the boiler hadn't been working for a couple of days?

Q:     According to this.  Now, like I said, I can't – I'm not going from my memory.  But according to these notes, that's what she said. And that would be the first thing – one of the things I would put in there, because thing about it, it was February 15th and it was cold, and my first question would be, how long has it been off.

A:     So on February 11, when you arrived at the home, the boiler was off?

Q:     It was off when I arrived there.

*          *          *

Q:     So when you arrived it was off, when you left it was off?

A:     Yes.

(Wilson Dep. 13:18-14:12, 15:14-15.)  Mr. Wilson detected no gas leaking and left the Property with the boiler not working.  Mr. Wilson explained that it is not DTE's job to get the furnace back up and running after they have cleared the Property for a suspected gas leak.  (Wilson Dep. 28:11-29:3.)

On Saturday, February 21, 2015, just ten days after Mr. Wilson made the DTE service call to the Property and found the boiler not in working condition, Plaintiff left the Property with her children and went to stay with her mother because the heat was not working and the house was so cold.  (Pl.'s Dep. 56:3-61:13.)  Plaintiff testified as follows in her deposition:

Q:     Why did you decide to leave Annchester on that Saturday night?

A:     Because the house was cold.

*          *          *

Q:     And you know when you turned up the thermostat, the house didn't get warm?

A:     Yes.

Q: And you knew that when you turned up the thermostat, if the boiler's working, the house is supposed to get warmer, right?

A: Right.

Q: So you knew something was wrong with the boiler?

A: I assumed, right.

Q: Did you call someone to come fix it?

A: I came home the Monday to call somebody, because it was in the evening, the Saturday evening I leave, when I realize there's no heat, so I leave the house the Saturday evening.

                    *          *          *

Q: Did you shut off the water before you left?

A: No.

Q: Did you make sure there was no water in any of the lines before you left? Just yes or no, did you do that?

A: No.

Q: So you left the home on that Saturday night, when the boiler wasn't working and you didn't shut off the water, correct?

A: Right. But I plug in the space heater, one upstairs and one downstairs, and then I leave with the children. You cannot plug in a space heater with children in the house, so I plug them in and leave.

(Pl.'s Dep. 78:23-25, 79:12-25, 81:15-82:2.)

In direct contradiction to the testimony and records establishing that Mr. Wilson from DTE was called to the home on February 11, 2015, to find that the boiler was not working and had been off for a couple of days, Plaintiff testified that she had uninterrupted heat in the home from January 1, 2015 until Saturday February 21, 2015, when she left the home because the heat was not working and the house was cold:

Q:     Now in 2015, starting January 1, were you living at Annchester?

A:     Yes, sir.

                    *                    *                    *

Q:     And the furnace, boiler rather, wasn't working was it?

A:     When?

Q:     January, 2015.

A:     When it stop from work is the when – like you know you turn the heat up, turn the heat down, and then you're in the house and I said to my mom it's cold, and I play with the heat and it's cold. She said if the house is cold, come over here. So I went over there. . . . That's when the heat wasn't working. But the whole time before the heat work. The whole time before I had heat in the house.

Q:     So you're testifying from January 1, 2015 until the Saturday that you just described in 2015, the boiler was working?

A:     I have heat, yes.

(Pl.'s Dep. 74:17-75:16.)

Plaintiff, as a rental property manager, was well aware of the dangers of leaving

a home with no heat in the cold months of winter:

A:    When there's no one living in the house, like if there's no one
      living in the house, I cut everything off if there's no one living in
      the house. If there's no one living in the house, I ain't going to
      pay money. . . . All you have to do is to drain the pipe, you drain
      everything and cut off the water.

Q:    Why do you do that?

A:    Drain everything? Cut the water off because there's no one living
      in the house.

Q:    Why do you want to drain everything to cut the water off if no
      one's living in the house and you turned off the heat?

A:    No one not living in the house, so with no one not living in the
      house, you supposed to cut everything off and drain it because
      there's no one living inside there.

Q:    But what are you trying to do by draining the water out of the
      pipes, what are you trying to prevent when you do that?

A:    So water don't leak down inside the house.

Q:    You don't want water to leak, you don't want a pipe to burst when
      it's cold there's no heat in the home?

A:    Right.

Q:    Because if that happens, then you're going to have additional
      damage and problem with your investments, right?

A:      Right.

Q:      So . . . prior to 2014, when you didn't have a tenant in there, you would not pay the utilities and you would drain the water from the pipes to make sure the pipes didn't break?

A:      Right.

Q:      And you did that to protect the property, right?

A:      Right.

Q:      You did that because you didn't want floods and water damage, correct?

A:      Correct.

(Pl.'s Dep. 24:9-26:5.)

Plaintiff returned to the Property on Monday, February 23, 2015, around 3:00 p.m., having spent the weekend at her mother's house with her son Ackeem and her foster children.  (Pl.'s Dep. 88:7-20, 49:12-19.)  When she walked into the house through the side door she could hear water running and she saw water coming down into the kitchen and went up the stairs to find water running on the floor in the bathroom and what looked like a burst water tank on the toilet.  (Pl.'s Dep. 65:11-69:21, 95:22-97:15.)  Plaintiff called her brother Dean Samuels, who came to the Property, turned off the water, and told Plaintiff to call her insurance company.  (Pl.'s Dep. 69:23-71:13.)  Plaintiff testified that she called Allstate on Tuesday, February

24, 2015, to report the loss. (Pl.'s Dep. 71:15-73:5.)

Plaintiff contacted a public adjuster, Raymond Fair, to assist her with mitigating, repairing, and submitting a claim to Allstate for the February 23, 2015 loss. Mr. Fair was referred to her by Plaintiff's friend Bilroy Nicholas. (Pl.'s Dep. 98:12-22.) Plaintiff testified that Mr. Fair came to the Property but did not take any pictures and sent some people to the Property to assess the damage. Plaintiff can't remember exactly who came but she recalls that Mr. Fair sent some people to dry out the water. (Pl.'s Dep. 99:9-100:22.) On Plaintiff's behalf, Mr. Fair filled out a one-page Proof of Loss, related to the February 23, 2015 loss, that Mr. Fair had Plaintiff sign on April 3, 2015. (Pl.'s Dep. 112:20-113:115:7; Def.'s Resp. to Pl.'s Mot. Ex. 12, April 3, 2015 Proof of Loss.) Without any detail or supporting documentation, the April 3, 2015 Proof of Loss claimed $84,328 for damage to the building, $60,000 for damage to the contents, and $12,000 for loss of use. (April 3, 2015 Proof of Loss.) These figures were noted to be "subject to change." (*Id.*)

Allstate engaged Chad Peterson from Donan to conduct another inspection of Plaintiff's home in connection with their investigation of the February 23, 2015 loss. (Def.'s Resp. to Pl.'s Mot. Summ. J. Ex. 8, April 23, 2015 Report of Chad Peterson.) Mr. Peterson, who had conducted the May 20, 2014 inspection of the Property and found the boiler in disrepair, conducted his second inspection of the Property on

March 18, 2015. The main purpose of Mr. Peterson's inspection was to determine if the boiler had been repaired since he found it in disrepair during his April 23, 2015 inspection. (April 23, 2015 Peterson Report 1.) Plaintiff represented, as discussed *supra*, that the boiler had been repaired by Lonnie of Strickly H/C on May 5, 2014, and Plaintiff submits the May 5, 2014 Invoice from Strickly as evidence of that repair. Mr. Peterson's April 23, 2015 Report explains that on his earlier inspection of the Property on May 20, 2014, he found no evidence of any recent repairs to the boiler or the radiators, as suggested in the May 5, 2014 Invoice from Strickly, which purports to have preceded Mr. Peterson's May 20, 2014 Inspection of the Property by two weeks:

> The invoice for repairs to the radiators and cleaning and inspection of the boiler was dated about two weeks prior to my initial inspection; May 5, 2014, and May 20, 2014, respectively. A review of the photographs taken during the initial inspection showed no evidence of any radiator repairs. Furthermore, the invoice does not mention the long-term water leaking from a corroded pipe next to the boiler in the basement. The boiler system did not appear to have been repaired in any way during the initial study that followed the February 2014 date of loss when Ms. Samuels reported hearing the radiator in the living room venting steam. Likewise, there is no evidence that repairs have been made to the boiler and radiators prior to the most recent winter. During the March 18, 2015, study, it was evident that someone had: removed the front panel around the heat exchanger tubes of the boiler; turned off the electrical switch on the east side of the boiler; removed the cover and wires of the makeup water valve; shut off all three valves in the makeup water line; and opened the relief valve on top of the boiler. The corroded pipe that was badly leaking during the 2014 study had not been replaced, and

there was no water on the floor beneath it. The boiler was not in operating condition during the March 18, 2015 study.

The water lines located in the ceilings of the living room and dining room that supply the second-floor radiators appear to have leaked during the May 2014 study. There is no evidence that the lines have been repaired. The ceilings have not been removed in order to access and repair the lines.

The boiler system shows no evidence of being repaired following the 2013/2014 winter. During the 2014/2015 winter, the water in the second-floor toilet tank froze, expanded, and fractured the tank. The water froze because proper temperatures were not being maintained in the house. The boiler system does not appear to have been operating during the 2014/2015 winter.

(April 23, 2015 Peterson Report.) Mr. Peterson's Report is substantiated by photographs of the boiler and damaged areas of the home, which can be compared to the photographs attached to his June 3, 2014 Report. (*Id*.)

On May 5, 2015, while still in the process of investigating Plaintiff's claim, Allstate rejected Plaintiff's Proof of Loss related to the February 23, 2015 water damage. (Def.'s Resp. to Pl.'s Mot. Summ. J. Ex. 13, May 5, 2015 Denial Letter.) Allstate explained to Plaintiff that her Proof of Loss was being rejected because: (1) it failed to state the Actual Cash Value of the claim and information in support; (2) the amount claimed was vague and could not be verified with the limited information provided; and (3) it failed to state the Whole Loss and Damage amount. (*Id*.) Allstate provided Plaintiff with a blank Sworn Statement of Proof Loss to be completed with

the missing detailed information and returned to Allstate within ten (10) days. (*Id*.) On August 28, 2017, Plaintiff signed an Amended sworn Proof of Loss dated August 17, 2017, this time claiming $125,073 building damage, $89,164 in contents damage, and $25, 546 for loss of use. (Def.'s Resp. to Pl.'s Mot. Ex. 14, August 17, 2017 Amended Proof of Loss.) Like the original Proof of Loss, the Amended Proof of Loss was a single page form, filled out by Mr. Fair and signed by Plaintiff, that attached no documents and provided no supporting detail. (*Id*.) On September 15, 2017, Allstate again rejected Plaintiff's Amended Proof of Loss for the same reasons of vagueness and failure to provide supporting documentation. (Def.'s Resp. to Pl.'s Mot. Ex. 15, September 15, 2017 Denial Letter.)

On October 5, 2015, Allstate formally denied Plaintiff's claim based on the alleged loss of February 23, 2015, citing the following bases for the denial:

> 1. You have willfully concealed and misrepresented facts and circumstances of a material nature with the intent to defraud us, including, among other things, concealments and misrepresentations regarding the facts and circumstances in connection to the February 23, 2015 loss;
>
> 2. You have presented false affidavits, documents, and information, including, but not limited to, a document entitled "Sworn Statement in Proof of Loss" in connection with your claims, which contains materially false information; and
>
> 3. You have breached the contract of insurance in your failure to maintain heat in the building structure and/or to shut off the water supply and drain all plumbing systems in the structure.

(Def.'s Resp. to Pl.'s Mot. Ex. 16, October 5, 2015 Claim Denial Letter.)

Christopher Connolly, the Allstate adjustor who processed Plaintiff's February 23, 2015 claim, testified that Allstate "highly rejected" Plaintiff's Sworn Proof of Loss statements because they were vague and completely unsupported by sufficient documentation. (Def.'s Resp. to Pl.'s Mot. Summ. J. Ex. 17, May 3, 2017 Deposition of Christopher Connolly 7:14-8:17.) Mr. Connolly testified that Allstate further concluded that Plaintiff had "willfully concealed and misrepresented" that "the boiler system had been made operable after the prior loss and that adequate heat was maintained within the home to prevent freezing or pipe burst issues." (Connolly Dep. 10:16-21.) Connolly testified that on March 30, 3015, Plaintiff stated directly to Connolly that the April, 2014 heating system claim had been repaired. (*Id*. at 15:16-16:3.) Connolly also bases the misrepresentation denial on the May 5, 2014 Strickly H/C invoice, which Plaintiff falsely presented to Allstate as evidence that the repairs to the boiler had been made after the April, 2014 loss. (*Id*. at 17:18-18:13.) Allstate also concluded that "the contents being claimed at sixty thousand dollars were in conflict with our Adjuster's observations at the scene." (*Id*. at 12:7-10.)

### B. Mr. Nicholas's Second Deposition, Lonnie Mitchell's Post-Deposition Affidavit, and Testimony of Dodge, Shelton and Dehaney

Plaintiff's friend, Bilroy Nicholas, who allegedly patched Plaintiff's drywall in her living room following the April 2014 water damage, was initially deposed in this

action on May 9, 2017.  In that deposition,  Mr. Nicholas testified that he "believed" Lonnie did some work for Plaintiff but he never actually saw Lonnie do any work at the Property:

> Q:    Did you ever see Lonnie Mitchell at Ms. Samuel's Annchester Road property?
>
> A:    I can't recall. No, I can't recall.
>
> Q:    No, you can't recall seeing him there?
>
> A:    No. And Lonnie have done some work for me as well in one of my properties some years ago.
>
> Q:    Do you know if Lonnie ever did work at Annchester Road?
>
> A:    I believe so. I think Faith had told me that he did, but I never physically see him do the work.
>
> Q:    Did Ms. Samuels tell you what Lonnie did at the Annchester Road property?
>
> A:    Not specifically.
>
> Q:    How about generally?
>
> A:    Generally, I believe he was the one that had fixed the problem in the ceiling with that valve that had caused the damage.

(Pl.'s Resp. to Def.'s Mot. Summ. J. Ex. 7, Nicholas Dep. I 32:22-33:6.)

On August 4, 2017, Mr. Nicholas was deposed again at Plaintiff's request. Through Mr. Nicholas's testimony at his second deposition, Plaintiff sought to establish that Mr. Mitchell could not have performed work at the Property in the

winter of 2013 because he, Mr. Nicholas, was the person who introduced Mr. Mitchell to Plaintiff and he did not introduce them until April, 2014 – suggesting that the Plaintiff's assertion that the boiler was repaired on May 5, 2014, was not false. (Pl.'s Resp. to Def.'s Mot. Summ. J. Ex. 8, August 4, 2017 Deposition II of Bilroy Nicholas.) Mr. Nicholas testified that Plaintiff and Mr. Mitchell did not know one another before he introduced them in April, 2014, and that he did not introduce them at any time in November or December of 2013. (Nicholas II Dep. 7:1-24.) On cross-examination, Mr. Nicholas stated that Plaintiff's counsel contacted him asking that he sit for another deposition "for the sole purpose of regarding [sic] the sole issue of when did Lonnie Mitchell repair Faith Samuels' furnace." (Nicholas II Dep. 8:25-11:17.) Mr. Nicholas did not admit that he was told, prior to his second deposition, that Mr. Mitchell had testified that he performed the work on Plaintiff's boiler in November or December, 2013. (Nicholas Dep. II 12:25-13:15.) Mr. Nicholas confirmed, as he testified in his first deposition, that he never saw Mr. Mitchell doing any work at Plaintiff's home, that he did not really know what work Mr. Mitchell did perform and that he would not be able to say that Mr. Mitchell's testimony that he did work for Plaintiff on her boiler in November or December 2014 was false. He could only say that he introduced them and that he did so in April, 2014. (Nicholas Dep. II 15:16-16:2.) Oddly, although Mr. Nicholas cannot remember exactly what work Mr.

Mitchell performed Plaintiff, and he recalled that it was drywall work, he did remember that he referred Mr. Mitchell to Plaintiff because "she was having a problem with her radiator." (Nicholas Dep. II 17:4-13.) Mr. Nicholas could not rule out the possibility that Mr. Mitchell did indeed do work on Plaintiff's boiler in November or December, 2013:

> Q: All right. So it's possible that Mr. Mitchell was correct in his deposition when he said he was at Ms. Samuels' home in November, December 2013? You don't know if he was there or not at that time, right?
>
> A: 2013, I can't say that. Because the time that I introduced them was 2014. What happened before wasn't an introduction that I had anything to do with.

(Nicholas Dep. II 26:2-8.) Mr. Nicholas said it did not appear to him when he introduced them that Plaintiff knew who Mr. Mitchell was, or at least "she gave no indication of that." (*Id*. at 26:9-18.)

Plaintiff also submits an October 10, 2017 Affidavit by Lonnie Mitchell, Mr. Mitchell states that he has reviewed his July 25, 2017 Deposition and realized that some of his statements were inaccurate and not true. (Pl.'s Resp. to Def.'s Mot. Summ. J. Ex. 9, Oct. 10, 2017 Affidavit of Lonnie Mitchell ¶ 3.) Specifically, Mitchell states in his Affidavit that when he testified that he inspected Plaintiff's boiler system and repaired her radiators in the winter months of 2013, it was not true. (*Id*.) Mr. Mitchell states that after having discussions with Mr. Nicholas and reviewing

24

his "records," he realizes that he had Plaintiff confused with another customer that he serviced in the winter months of 2013, but that woman was not the Plaintiff. (*Id*. ¶ 4.) Mr. Mitchell does not attach any records to his Affidavit, nor does he identify the "other customer" with whom he confused the Plaintiff. Mr. Mitchell also states that he learned after his deposition that Plaintiff does not have an email address so he "assumes" that he mistakenly testified that he had emailed her an invoice in May, 2014. (*Id*. ¶ 5.) Mr. Mitchell now swears that he had never met the Plaintiff until Mr. Nicholas introduced them and that he has now refreshed his memory by discussing the matter with Mr. Nicholas and swears that he performed the repairs on Plaintiff's radiators on May 5, 2014, and that he could not possibly have performed these repairs in November or December, 2013, because he had not yet met Plaintiff or been to her home at that time. (*Id*. ¶ 7.)

Plaintiff also introduces the deposition testimony of Ms. Sloan Shelton, a billing specialist from DTE who testified that DTE was supplying gas to Plaintiff's home throughout the winter months of 2015. (Pl.'s Resp. to Def.'s Mot. Summ. J. Ex. 4, Sept. 18, 2017 Deposition of Sloan Shelton.) Ms. Shelton testified, based upon her review of DTE records, that the gas was on at Plaintiff's Property during January and February, 2015, although the usage was low. (Shelton Dep. 21:2-24.) Ms. Shelton could not say whether or not the furnace was working, or whether the usage was

attributable to other gas powered appliances such as the stove or hot water heater, but she could say that gas was being delivered to the home.  (Shelton Dep. 22:23-23:2, 25:5-15.)

Plaintiff also submits the deposition testimony of John Dodge.  Mr. Dodge is a social worker who was employed by the Commonwealth Star Agency, and performed licensing and compliance reviews of foster parents for children placed by Commonwealth.  (ECF No. 37, Def.'s Reply, Ex. 4, May 9, 2017 Deposition of John Dodge.)  Mr. Dodge testifies that he originally licensed Plaintiff as a foster parent and performed a compliance review of Plaintiff's home on June 18, 2014.  (Dodge Dep. 17:6-20:20.)  The check-box compliance form, which does not have a separate entry for reviewing compliance of a boiler heating system as opposed to a forced air furnace, showed that Plaintiff's heating system was "in compliance" with Commonwealth and state guidelines.  (Def.'s Reply Ex. 5,Children's Foster Home Rules Compliance Record, June 18, 2014.)  Dodge conceded at his deposition that he has no background in heating and cooling and did not give Plaintiff's heating system anything other than a cursory visual inspection.  In fact, given that his compliance review was in June, the heat was not even on in the home. (Dodge Dep. 12:1-14, 29:9-30:16, 52:3-22.)  In fact, when shown the pictures of the condition of Plaintiff's Property and boiler heating system as Allstate found it in May, 2014, Mr. Dodge

stated that he was "disheartened" that he had missed these troubling conditions. (Dodge Dep. 64:19-85:11.)

Finally, Plaintiff offers the Affidavit of her son, Ackeem Dehaney, who testifies that in February, 2015, his mother told him she smelled gas at the Property and he personally went down to the basement and turned the boiler off. (Pl.'s Resp. to Def.'s Mot. Summ. J. Ex. 11, Affidavit of Ackeem Dehaney ¶ 3.[1]) Mr. Dehaney testified that a repair person did come out to the home to check for a gas leak. (*Id.*) After learning from his mother that there was no leak, Mr. Dehaney went down to the basement and turned the boiler back on, the same day that the repair person had come, and the house began to heat. (*Id.* ¶ 4.)

## II.    STANDARD OF REVIEW

### A.    Summary Judgment

Summary judgment is appropriate where the moving party demonstrates that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(a). A fact is "material" for purposes of a summary judgment motion where proof of that fact "would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense

---

[2] This Affidavit is dated __ 18, 2017. The month is missing. However, the Affidavit is Notarized and there has been no challenge to its authenticity.

asserted by the parties." *Midwest Media Prop., L.L.C. v. Symmes Twp., Ohio*, 503 F.3d 456, 469 (6th Cir. 2007) (quoting *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984)). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"Rule 56(e) identifies affidavits, depositions, and answers to interrogatories as appropriate items that may be used to support or oppose summary judgment." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009). "Of course, [the moving party] always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Taft Broadcasting Co. v. United States*, 929 F.2d 240, 247 (6th Cir. 1991) (internal quotation marks omitted) (quoting *Celotex*, 477 U.S. at 323). If this burden is met by the moving party, the non-moving party's failure to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," will mandate the entry of summary judgment. *Celotex*, 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts

immaterial." *Id.* at 323.

"The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. The plaintiff must present more than a mere scintilla of the evidence. To support his or her position, he or she must present evidence on which the trier of fact could find for the plaintiff." *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000) (internal citations and quotation marks omitted). The non-moving party may not rest upon the mere allegations or denials of his pleadings, but the response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts which demonstrate that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (footnote and internal quotation marks omitted).

In making the determination on summary judgment whether there are genuine issues of material fact for trial, the court must draw all reasonable inferences in favor of the non-moving party. *See Moran v. Al Basit LLC*, 788 F.3d 201, 204 (6th Cir. 2015). "'The central issue is whether the evidence presents a sufficient disagreement

to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Binay v. Bettendorf*, 601 F.3d 640, 646 (6th Cir. 2010) (quoting *In re Calumet Farm, Inc.*, 398 F.3d 555, 558 (6th Cir. 2005)). At the same time, plaintiff must produce enough evidence to allow a reasonable jury to find in his favor by a preponderance of the evidence, *Anderson*, 477 U.S. at 252, and "[t]he 'mere possibility' of a factual dispute is not enough." *Martin v. Toledo Cardiology Consultants, Inc.*, 548 F.3d 405, 410 (6th Cir. 2008) (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992)). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 (internal citations omitted).

Ultimately, the party who bears the burden of proof must present a jury question as to each element of the claim. *See Davis*, 226 F.3d at 511. Plaintiff cannot meet that burden by relying solely on "[c]onclusory assertions, supported only by [his or her] own opinions." *Arendale v. City of Memphis*, 519 F.3d 587, 560 (6th Cir. 2008). Plaintiff must show probative evidence, based "on more than mere speculation, conjecture, or fantasy," to prevail. *Id.* at 601 (quoting *Lewis v. Philip Morris Inc.*, 355 F.3d 515, 533 (6th Cir.2004)).

When the Court is faced with cross-motions for summary judgment, each motion must be evaluated on its merits and in light of the applicable burdens at the

summary judgment stage:

> The fact that the parties have filed cross motions for summary judgment does not automatically justify the conclusion that there are no facts in dispute. *Parks v. LaFace Records*, 329 F.3d 437, 444 (6th Cir. 2003) ("The fact that the parties have filed cross-motions for summary judgment does not mean, of course, that summary judgment for one side or the other is necessarily appropriate."). Instead, the Court must apply the well-recognized summary judgment standards when deciding such cross motions: the Court "must evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party." *Westfield Ins. Co. v. Tech Dry, Inc.*, 336 F.3d 503, 506 (6th Cir. 2003).

*   *   *

In a defensive motion for summary judgment, the party who bears the burden of proof must present a jury question as to each element of the claim. *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000). Failure to prove an essential element of a claim renders all other facts immaterial for summary judgment purposes. *Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 895 (6th Cir.1991).

When the moving party also bears the ultimate burden of persuasion, the movant's affidavits and other evidence not only must show the absence of a material fact issue, they also must carry that burden. *Vance v. Latimer*, 648 F.Supp.2d 914, 919 (E.D. Mich. 2009); *see also Resolution Trust Corp. v. Gill*, 960 F.2d 336, 340 (3d Cir. 1992); *Stat–Tech Liquidating Trust v. Fenster*, 981 F.Supp. 1325, 1335 (D. Colo. 1997) (stating that where "the crucial issue is one on which the movant will bear the ultimate burden of proof at trial, summary judgment can be entered only if the movant submits evidentiary materials to establish all of the elements of the claim or defense"). The plaintiff therefore "must sustain that burden as well as demonstrate the absence of a genuine dispute. Thus, it must satisfy both the initial burden of production on the summary judgment motion—by showing that no genuine dispute exists as to any material fact—and the ultimate burden of persuasion on the claim—by showing that it would be entitled to a directed verdict at trial."

William W. Schwarzer, et al., The Analysis and Decision of Summary Judgment Motions, 139 F.R.D. 441, 477-78 (1992) (footnotes omitted).

*Ely v. Dearborn Heights School Dist. No. 7*, 150 F. Supp. 3d 842, 849-50 (E.D. Mich. 2015).

All evidence submitted in opposition to a motion for summary judgment must ultimately be capable of being presented in a form that would be admissible at trial:

> The submissions by a party opposing a motion for summary judgment need not themselves be in a form that is admissible at trial. Otherwise, affidavits themselves, albeit made on personal knowledge of the affiant, may not suffice, since they are out-of-court statements and might not be admissible at trial. *See* Fed.R.Evid. 801(c), 802. However, the party opposing summary judgment must show that she can make good on the promise of the pleadings by laying out enough evidence that will be admissible at trial to demonstrate that a genuine issue on a material fact exists, and that a trial is necessary. Such "'evidence submitted in opposition to a motion for summary judgment must be admissible.'" *Alpert v. United States*, 481 F.3d 404, 409 (6th Cir. 2007) (quoting *United States Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185, 1189 (6th Cir.1997)). That is why "'[h]earsay evidence . . . must be disregarded.'" *Ibid*. It is also the basis of this court's repeated emphasis that unauthenticated documents do not meet the requirements of Rule 56(e).

*CareSource*, 576 F.3d at 558-59 (internal citations omitted).

## B. Exclusion of Expert Testimony

"Admissibility of expert testimony is governed by Federal Rule of Evidence 702 and informed by the seminal case applying Rule 702, *Daubert v. Merrell Dow*

*Pharmaceuticals, Inc*., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)." *In re Southeastern Milk Antitrust Litigation*, 739 F.3d 262, 267 (6th Cir. 2014). Fed. R. Evid. 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

"[T]he rules of evidence - especially Rule 702 - do assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993). The trial court's "gatekeeping" task with respect to expert testimony applies not just to scientific evidence, as was at issue in *Daubert*, but to all types of specialized knowledge presented through an expert witness. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 148-49 (1999). ""[T]he relevant reliability concern may focus upon personal knowledge or experience . . . [as] there are many different kinds of experts, and many different kinds of expertise." *Id*. at 150. The Court must

analyze separately the proposed expert's qualification, reliability and helpfulness.

The Sixth Circuit has noted that absolute certainty is not required of an expert but that sheer speculation, regardless of the qualifications of the speculator, lacks sufficient reliability:

> Rule 702, we recognize, does not require anything approaching absolute certainty. *See Daubert*, 509 U.S. at 590, 113 S.Ct. 2786. And where one person sees speculation, we acknowledge, another may see knowledge, which is why the district court enjoys broad discretion over where to draw the line.

*Tamraz v. Lincoln Elec. Co*., 620 F.3d 665, 671-72 (6th Cir. 2010).

To determine the testimony's reliability, the court does not "determine whether [the opinion] is correct, but rather [determines] whether it rests upon a reliable foundation, as opposed to, say, unsupported speculation." *In re Scrap Metal Antitrust Litig*., 527 F.3d 517, 529–30 (6th Cir. 2008). "As gatekeeper, the trial court only determines the admissibility of expert evidence; the jury determines its weight. The court's focus is 'solely on principles and methodology, not on the conclusions that they generate.'" *United States v. Stafford*, 721 F.3d 380, 393-94 (6th Cir. 2013) (quoting *Daubert*, 509 U.S. at 595) (alterations in original). "[R]ejection of expert testimony is the exception, rather than the rule." *In re Scrap Metal*, 527 F.3d at 530. Testimony based on allegedly erroneous facts will generally be permitted "when there is some support for those facts in the record." *Id*.

## III. ANALYSIS

### A. Allstate's Motion for Summary Judgment

Allstate's October 5, 2015 Letter denying Plaintiff's claim gave three separate bases for denying her claim, each of which forms the basis, to one degree or another, for Allstate's motion for summary judgment: (1) that Plaintiff willfully concealed and misrepresented material facts with the intent to defraud Allstate in connection with the February 23, 2015 loss; (2) that Plaintiff presented false statements in a Sworn Statement of Proof of Loss; and (3) that Plaintiff breached the contract of insurance by failing to maintain heat in the building and/or to shut off the water supply and drain the system while the building was "unoccupied." (Def.'s Resp. to Pl.'s Mot. Summ. J. Ex. 16, Oct. 5, 2015 Denial Letter; Connolly Dep. 10:16-21, 11:11-17, 2:7-9.)

### 1. Allstate's fraud and misrepresentation claim respecting the boiler.

Defendant identifies the following false and material misrepresentations: (1) Plaintiff misrepresented that "Clarence" repaired her boiler when in fact it was Lonnie Mitchell whom Plaintiff claims repaired the boiler; (2) Plaintiff presented a May 5, 2014 invoice from Lonnie Mitchell to Allstate as a representation that she had the boiler repaired on that date, falsely representing that she did address pre-existing heating problems and corrected them and made the boiler operable again; and (3) Plaintiff misrepresented that her boiler was consistently operational throughout the

35

months of January and February, 2015, just prior to the February 23, 2015, loss that forms the basis for her claims that are the subject of this action.

To establish its claim that Plaintiff violated the fraud and misrepresentation provision of the Policy, Allstate must show that the facts concealed or misrepresented by Plaintiff were material, that they were false and that Plaintiff knew her statements were false or that she made them with reckless disregard for their truth intending that Allstate rely on them:

> To void a policy because the insured has wilfully misrepresented a material fact, an insurer must show that (1) the misrepresentation was material, (2) that it was false, (3) that the insured knew that it was false at the time it was made or that it was made recklessly, without any knowledge of its truth, and (4) that the insured made the material misrepresentation with the intention that the insurer would act upon it. A statement is material if it is reasonably relevant to the insurer's investigation of a claim.

*Mina v. Gen'l Star Indemnity Co.*, 218 Mich. App. 678, 686 (1996), *rev'd in part on other grounds*, 455 Mich. 866 (1997) (citing *Dadurian v. Underwriters at Lloyd's of London*, 787 F.2d 756, 759-60 (1st Cir. 1986)).

As to Plaintiff's misstatement that "Clarence" fixed the boiler, when in fact it was Lonnie Mitchell who Plaintiff claims came to fix the boiler, Allstate has failed to demonstrate that there is no genuine issue of material fact that this misstatement was either intended to mislead Allstate in some way or that it was material in any way to the ultimate denial of Plaintiff's claim. At her EUO, Plaintiff openly corrected her

verbal misstatement (which was not made under oath) regarding the identity of the individual who she claims repaired her boiler and a reasonable juror could conclude that this verbal alleged misstatement was made innocently and not to intentionally mislead Allstate regarding Plaintiff's claimed loss.

With regard to the alleged misrepresentations as to the timing of the repair of the boiler and its continuous operation during the months of January and February, there is no dispute that the representations regarding the repair and operability of the boiler were in general material – Allstate had cited the inoperable and deteriorated condition of the boiler in May, 2014, as the basis for denial of that claim and Plaintiff immediately assured Allstate when reporting the February, 2015, frozen pipe incident that she had repaired the boiler, demonstrating her knowledge of the materiality of the condition of the boiler in connection with that later claim. In support of its claim that Plaintiff falsely misrepresented that she had repaired the boiler following the May, 2014 loss, Defendant relies on the April 23, 2015, engineering report prepared by Chad Peterson from Donan Engineering which states that Mr. Peterson inspected Plaintiff's boiler after the April, 2014 claim that Defendant denied and also inspected the boiler following the February 23, 2015 loss and determined that boiler was in the same condition in February, 2015 that it was in April 2014, and that no repairs had been made to the boiler.

Defendant also relies on the testimony of Maurice Wilson from DTE who testified that he responded to a call of a suspected gas leak at Plaintiff's home on February 11, 2015, and found the boiler not working and was informed by Plaintiff that the boiler had not been working for "the past couple of days." This testimony discredits Plaintiff's testimony that the heat was working in her home *uninterrupted* in the months of January and February up until February 21, 2015, when Plaintiff left the home to spend the night with her mother. Defendant also relies on Plaintiff's own alleged misrepresentation in her EUO that her boiler had been repaired: "Q: Okay. Did you report to Allstate that you had the boiler repaired? A: Yeah, when they asked me if I have it repaired tell them yes." (Pl.'s EUO 93:14-17.) Plaintiff also expressly answered in her EUO that the corroded pipe identified by Mr. Peterson in his May 2014 Report had been replaced: "Q: Okay. What, what I'm asking is did he fix that corroded pipe, did he replace that pipe? A: Yes, he did." Mr. Connolly from Allstate confirmed that Plaintiff reported to him directly that following the May, 2014 claim denial, she had repairs done to the boiler to make it operable.

The two Chad Peterson reports, supported by the photographs of the boiler, support Allstate's claim that the boiler and corroded pipe which Plaintiff unequivocally testified were repaired by Mr. Mitchell on May 5, 2014, were not repaired by him on that date. Mr. Peterson reports that he found the boiler in the same

38

condition on April 23, 2015 as he left it on May 20, 2014. Mr. Mitchell's deposition testimony, establishing that he worked on Plaintiff's boiler in the winter months of 2013, also supports Allstate's position that Mr. Mitchell did whatever repairs or "inspection" he did do in November or December, 2013, not in May, 2014, and that Plaintiff called him in May, 2014 to obtain a copy of the invoice for that earlier work. All of this evidence supports the reasonable inference that Plaintiff presented the invoice dated May 5, 2014 to Allstate as evidence that repairs were performed and the corroded pipe replaced on that date with knowledge that the repairs had not been performed on that date and intended that Allstate rely on that representation in determining whether to pay her February 2015 claim.

However, in resolving Allstate's motion for summary judgment, the Court must view the facts in the light most favorable to the Plaintiff and Plaintiff has presented evidence which supports a reasonable inference otherwise. Plaintiff relies on her own testimony, the second deposition of Bilroy Nicholas, the post-deposition Affidavit of Lonnie Mitchell, directly contradicting his deposition testimony, the testimony of Sloan Shelton regarding gas usage at Plaintiff's home throughout the winter months of 2015, John Dodge's June 2014 Compliance report, and the Affidavit of her son, to establish that Plaintiff did in fact have work done to make the boiler operable on May 5, 2014.

First Plaintiff's own testimony that she called Mr. Mitchell directly after Allstate denied her claim on May 1, 2014, and had him come to repair the boiler on May 5, 2014, does fit the time frame established by Allstate's denial of her April 2014 claim. Second, Bilroy Nicholas's testimony obtained in his second deposition, that he was the person to introduce Mr. Mitchell to Plaintiff and that he did not introduce them until April, 2014, suggests that the repairs by Mr. Mitchell could not have been performed in November or December, 2013. Third, the corrected Affidavit of Mr. Mitchell, stating that his memory has now been corrected by Mr. Nicholas and by Mr. Mitchell's own records, and that he is now certain that he performed work at Plaintiff's home in May, 2014, and not in November or December, 2013, certainly supports the inference that Plaintiff was not falsely representing to Allstate that work was performed on the boiler in May, 2014. Mr. Mitchell's Affidavit certainly presents issues of admissibility, as discussed below, but also supports Plaintiff's view of the facts. Allstate clarified at the hearing that its fraud claim is based on the alleged intentional misrepresentation by the Plaintiff regarding *when* Mr. Mitchell repaired her boiler, not whether he successfully repaired her boiler. Thus, if a reasonable jury could conclude that Mr. Mitchell did in fact come to Plaintiff's home in May 2014, to repair the boiler, it is not material whether he did a good job or a poor job.

Mr. Mitchell's Affidavit, while creating a genuine issue of fact on this issue, also presents a direct contradiction on an important and material fact and cannot be considered by the Court unless there is a "persuasive argument" to explain the contradiction: "[A] district court deciding the admissibility of a post-deposition affidavit at the summary judgment stage must first determine whether the affidavit directly contradicts the nonmoving party's prior sworn testimony." *Aerel, S.R.L., v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 908 (6th Cir. 2006). "A directly contradictory affidavit should be stricken unless the party opposing summary judgment provides a persuasive justification for the contradiction." *Id.* If the affidavit does directly contradict prior testimony, then the court must strike the affidavit "unless the party opposing summary judgment provides a persuasive justification for the contradiction." *Id. See also Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999) ("[A] party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity."); *Dotson v. U.S. Postal Service*, 794 F. Supp. 654, 659 (6th Cir. 1991) ("While an inconsistent affidavit may preclude summary judgment if the affiant was confused during the deposition, the affidavit must clearly explain why the deponent was confused."); *Bailey v.*

*United Airlines*, 279 F.3d 194, 201 (3d Cir. 2002) ("Where the witness was confused at the earlier deposition or for some other reason misspoke, the subsequent correcting or clarifying affidavit may be sufficient to create a material dispute of fact."); *Commercial Underwriters Ins. Co. v. Aires Environmental Servs., Ltd.*, 259 F.3d 792, 799 (7th Cir. 2001) (Recognizing that "in general, parties may not patch up potentially damaging deposition testimony with a contradictory affidavit," but explaining that courts will "accept a contradictory supplemental affidavit if the party offers a suitable explanation such as confusion, mistake, or lapse in memory [] for the discrepancy.") (internal quotation marks and citations omitted) (alteration in original); *DeLone v. Eli Lilly & Co.*, 990 F. Supp. 2d 865, 872 (S.D. Ind. 2013) ("When a conflict arises between a plaintiff's sworn testimony and a later affidavit or declaration, the affidavit is to be disregarded unless it is demonstrable that the statement in the deposition was mistaken, perhaps because the question was phrased in a confusing manner or because a lapse of memory is in the circumstances a plausible explanation for the discrepancy."); *Martin v. Unknown Marshals*, 965 F. Supp. 2d 502, (D.N.J. 2013) ("[D]istrict court may disregard [summary judgment affidavit that contradicts prior testimony] unless there is independent evidence to bolster contradictory testimony."); *Armstrong v. Wes Health Sys.*, 188 F. Supp. 3d 478, (E.D. Pa. 2016) ("a district court is not always required to disregard an affidavit where it conflicts with deposition

testimony, and district courts have generally refused to do so where there is independent evidence in the record to bolster an otherwise questionable affidavit."); *Wells v. Bureau County*, 723 F. Supp. 2d 1061 (C.D. Ill. 2010) (Subsequent event refreshing memory between deposition and affidavit explained contradiction.); *Baer v. Chase*, 392 F.3d 609, 625 (3d Cir. 2004) (Where independent record evidence corroborates the contradictory affidavit that seeks to explain mistaken deposition testimony, courts have refused to disregard the affidavit and court can permit a party to introduce documentary evidence to support the contrary claims in a subsequently-filed affidavit.). The Court may conclude that a contradictory affidavit presents evidence that is for a jury, not the court, to weigh. *See, e.g., Croom v. Balkwill*, 645 F.3d 1240, 1253 n. 18 (11th Cir. 2011) (finding that district court "did not abuse its discretion in determining that the inconsistencies between Graham's affidavit and her deposition were more appropriately considered "variations of testimony" or "instances of failed memory" going to the weight and credibility of the evidence, as opposed to falsehoods rendering the affidavit a disregardable "sham.").

As these cases suggest, the Court has discretion to permit the consideration of a contradictory affidavit if it "persuasively explains" the reason for the contradiction – here an apparent lapse of memory. At his July 25, 2015 deposition, Mr. Mitchell was questioned extensively about the date on which he performed the

inspection/repair of Plaintiff's boiler. Mr. Mitchell testified that he was certain he did the repair work on Ms. Samuels's boiler and radiators in the winter months (either November or December) of 2013. When asked why his receipt for the work was dated May 5, 2014, Mr. Mitchell specifically recalled that Ms. Samuels had called him in May to obtain a copy of the receipt for the winter work he performed on her radiators and boiler. Mr. Mitchell now recalls, after speaking with Mr. Nicholas and reviewing "records" that have not been produced, that he had not met Ms. Samuels or been to her house before Mr. Nicholas introduced them in April, 2014, and now swears that he first went to Plaintiff's house in May, 2014, when he performed the work reflected in the May 5, 2014 invoice. Mr. Mitchell explains that he "must have" confused the work he did for another customer (who is not identified in the Affidavit) in the winter of 2013 with the work he did for Ms. Samuels in May, 2014.

This is a difficult call but the Court concludes that the better course is to leave this apparent instance of failed memory to the finder of fact who will be empowered to weigh competing evidence and determine issues of credibility. Is Mr. Mitchell's explanation for the contradiction "persuasive?" A reasonable juror could certainly appreciate how Mr. Mitchell could have been confused about events that occurred three years before his deposition. And Mr. Nicholas's testimony bolsters Mr. Mitchell's correction of his testimony. On the other hand, Mr. Mitchell was

questioned in many different ways about his recollection of when he performed work on Plaintiff's boiler in his deposition and was fairly unshakeable in his testimony that it was in the winter months. Mr. Mitchell even went so far as to point out the absurdity of repairing someone's boiler in May when no one is using their heat, and reiterated that he did not do this work for Plaintiff in May. But Mr. Mitchell has many customers and a reasonable juror could understand how Mr. Mitchell could have confused the Plaintiff with another customer with a similar problem. But these are issues best left to a jury. The Court will not exclude Mr. Mitchell's Affidavit.

Finally, as to the third alleged misrepresentation, i.e. that Plaintiff misrepresented to Allstate that her boiler was operational consistently throughout the months of January and February, 2015, Plaintiff has produced evidence creating a genuine issue of material fact regarding this alleged false statement: (1) the testimony of DTE billing employee Sloan Shelton establishing that DTE was providing "some level" of gas to Plaintiff's home throughout the months of January and February 2015, indeed Plaintiff was billed in excess of $200/month during those months, an amount that dropped precipitously to near $30/month for the usage period following the February 2015 boiler breakdown, (2) the testimony of Mr. Dodge, the Commonwealth Star compliance officer, who testified that he did not observe a problem with the boiler on his home visit in June, 2014, and (3) the testimony of Plaintiff's son that he

turned the boiler off before Mr. Wilson from DTE came to the home in February 2015, and then turned it back on after Mr. Wilson left. Viewing these facts in the light most favorable to the Plaintiff, as the Court must do when resolving Defendant's motion for summary judgment, they are sufficient to demonstrate a genuine issue of material fact regarding whether Plaintiff's boiler was operational during the time period relevant to the February 23, 2015 burst pipe and water damage loss.

### 2.    False statements in Plaintiff's Sworn Proof of Loss

Allstate's October 5, 2015 Denial letter also denied coverage based upon alleged false information contained in Plaintiff's Proof of Loss and Allstate has suggested that this is an additional basis for their summary judgment motion. Mr. Connolly, the Allstate adjustor responsible for analyzing Plaintiff's February 23, 2015 claim, testified that the basis for this denial was Plaintiff's claim in her Proof of Loss that the contents of the Property was valued at $60,000. Yet Mr. Connolly admitted in his deposition, and Allstate's counsel confirmed at the hearing on the motions for summary judgment, that Allstate had not done its own estimate of the contents and that therefore he did not actually know the statement claiming $60,000 to be materially false. (Connolly Dep. 20:11-23.)

According to Mr. Connolly, there was some mention by the onsite adjuster, Erin Verville, that some of the claimed damage to the contents was from the prior water

incident in April 2014, a claim that Allstate denied in May 2014. (Connolly Dep. 20:24-22:1.) Mr. Connolly testified that Ms. Verville surveyed the damage during her onsite visit but did not record any monetary valuation of the damage to the Property but did apparently verbally convey her feeling to Mr. Connolly that "it was kind of sparse inside the house, not much there." (Connolly Dep. 12:12-19.) There is no formal report from Ms. Verville in the record and no testimony, through deposition or otherwise, from Ms. Verville in the summary judgment record.

Allstate denied Plaintiff's claim, in part, because the Proof of Loss allegedly contained "materially false information" about the contents of the Property – i.e. Allstate alleges that Plaintiff fraudulently misrepresented that "there are sixty thousand dollars in content damages." Mr. Connolly, however, could not specify any basis for that claim at his deposition and in fact admitted that he did not know the statement that there were $60,000 in contents damages to be materially false – he apparently thought it "exaggerated" based on Ms. Verville's comments regarding the "sparse" furnishings. (Connolly Dep. 20:11-23.) Allstate also denied Plaintiff's claim in part because she allegedly made material false statements in her Proof of Loss regarding the damage to the building structure. The most Connolly could offer at his deposition to back up this basis for denial was the statement that he thought Ms. Verville had commented somewhere in her notes that Mr. Fair had included some pre-

existing damage in his assessment of the damage to the building. When asked at his deposition whether he had anything from Allstate to indicate what their estimate was for damage to the structure, Connolly stated that he didn't have such a document in his possession but if it did exist Allstate would produce it. (Connolly Dep. 20:24-22:2.) No such competing structure estimate has been made a part of the summary judgment record.

Allstate's arguments regarding the alleged "false statements" contained in the Proof of Loss are hard to pin down, but if Allstate is claiming that it denied Plaintiff's claim in its entirety because she made false misrepresentations in her Proof of Loss as to the amount of her damages, then it must do much more to establish the degree of falsity that would justify denying coverage altogether on that basis:

> Under Michigan law, in order to avoid or defeat a claim under an insurance policy such as the one at issue here, the insurer must prove that the insured actually intended to defraud the insurer. *West v. Farm Bureau Ins. Co.*, 402 Mich. 67, 69 (1977). "An exaggeration of the value as a mere opinion, a mere misstatement based upon an erroneous estimate of value, an honest mistake, an innocent overvaluation, lack the essential element of fraud and do not operate to avoid the policy." *Campbell v. Great Lakes Ins. Co.*, 228 Mich. 636, 638, 200 N.W. 457 (1924). In some instances, an insured's fraudulent intent may be inferred from the extreme disparity between the proof of loss and the actual loss. *Rayis v. Shelby Mutual Ins. Co.*, 80 Mich. App. 387, 264 N.W.2d 5, 7-8 n. 3 (1978). *See also Cooper v. Firemen's Ins.* Co., 148 F.2d 337 (6th Cir. 1945).

*D.R.C.D.T. Inc. v. Integrity Ins. Co.*, 816 F.2d 273, 277 (6th Cir. 1987).

Allstate has introduced no evidence that would permit the Court to make a summary judgment determination of the type of "extreme disparity" that would support a finding of fraud sufficient to vitiate the entire contract. Allstate has failed to demonstrate that there is no genuine issue of material fact that Plaintiff made false statements in her Proof of Loss and Allstate is not entitled to summary judgment based on these alleged misrepresentations.

### 3. Failure to maintain heat and/or shut off the water supply while the home was "unoccupied."

Plaintiff, a rental property manager herself, was well acquainted with the dangers of leaving a home without heat in the cold winter months. She testified that she understood that when leaving a property unattended, one had to take steps to prevent frozen pipes in the cold months, specifically by draining the water out of the system. Yet Plaintiff left her home, which was cold and without heat, and went to stay at her mother's house without returning home for two days. Plaintiff admits that she left the home because it was cold (although she did apparently leave two space heaters running) and she admits that she did not drain the water from the boiler system.

The challenge for Allstate with regard to this basis for their claim denial is that the Policy provision excluding coverage for failure to drain the pipes and shut off the water comes into play only when the building is "vacant, unoccupied, or under construction." Mr. Connolly acknowledged this limitation in his deposition. (Connolly

Dep. 25:4-25:14.) Mr. Connolly expressly stated in his deposition, and counsel for Allstate confirmed at the summary judgment hearing, that Allstate is not claiming that the home was "vacant" or "under construction," but is apparently claiming that the Property was "unoccupied." (Connolly Dep. 25:20-26:3; 35:2-36:2.)

The term "unoccupied" in the insurance context has been defined as "the lack of habitual presence of human beings (i.e., lack of animate objects)." *Myers v. Merrimack Mut. Fire Ins. Co*., 788 F.2d 468, 471 (7th Cir. 1986). Certainly leaving home for the weekend to visit one's mother cannot render the home "unoccupied" in any meaningful sense of the word. No doubt acknowledging the absurdity of such a position, Allstate suggests that the home was "unoccupied" from February 21, 2015, the night that Plaintiff left to go stay with her mother, until sometime in April, 2017, the time period during which Plaintiff testified she lived at her Fairfax residence because her home was not habitable after the February 23, 2015 loss. (ECF No. 36, Def.'s Resp. to Pl.'s Mot. Summ. J. 2-3, PgID 980-81.) But Allstate offers no explanation as to how the fact that the home was unoccupied *after* the pipes burst and the loss occurred on the weekend of February 21-23, 2015, establishes that the home was "unoccupied" at the time of the loss. The only relevant time period with respect to the February 23, 2015 loss was the time preceding the loss. Allstate's own records demonstrate that the February 23, 2015 loss was reported to Allstate at least as early

as March 9, 2015, and at that time Mr. Fair had already been to the home and begun remediation. (ECF No. 29, Def.'s Mot. Summ. J. Ex. 8 March 10, 2015 Activity Note.) The Court concludes as a matter of law that Plaintiff's home was not "unoccupied" at the time of the loss. Allstate is not entitled to summary judgment based upon this Policy exclusion.

### 4. Plaintiff's claim for 12% interest under the Michigan UDTPA.

Finally, Allstate seeks summary judgment in its favor on Plaintiff's claim that she is entitled to 12% interest on the amount of her unpaid claim under the Michigan Uniform Trade Practices Act ("MUDTPA"). The relevant provision of the MUDTPA provides:

> A person must pay on a timely basis to its insured, a person directly entitled to benefits under its insured's insurance contract, or a third party tort claimant the benefits provided under the terms of the policy, or, in the alternative, the person must pay to its insured, a person directly entitled to benefits under its insured's insurance contract, or a third party tort claimant 12% interest, as provided in subsection (4), on claims not paid on a timely basis. Failure to pay claims on a timely basis or to pay interest on claims as provided in subsection (4) is an unfair trade practice unless the claim is reasonably in dispute.

Mich. Comp. Laws § 500.2006(1). This provision requires the insurer to specify in writing to the insured those materials that will constitute a satisfactory proof of loss:

> An insurer shall specify in writing the materials that constitute a satisfactory proof of loss not later than 30 days after receipt of a claim unless the claim is settled within 30 days.

Mich. Comp. Laws § 500.2006(3).  This provision further states that:

> If benefits are not paid on a timely basis, the benefits paid bear simple interest from a date 60 days after satisfactory proof of loss was received by the insurer at the rate of 12% annum, if the claimant is the insured or a person directly entitled to benefits under the insured's insurance contract.

Mich. Comp. Laws § 500.2006(4).

Plaintiff filed her claim that is the subject of this litigation on or about February 23, 2015.  On March 12, 2015, less than 30 days from the date of the claim, Allstate sent correspondence to Plaintiff requesting a sworn statement and proof of loss.  (Def.'s Resp. to Pl.'s Mot. Ex. 11, March 12, 2015 Correspondence.)  That correspondence specified the required information and expressly referenced the relevant provisions of the Policy.  (*Id.*)  When Plaintiff submitted her Proof of Loss on April 3, 2015, Allstate rejected it and sent Plaintiff another letter explaining the deficiencies and requiring Plaintiff to submit another conforming sworn statement and proof of loss within 10 days.  (Def.'s Resp. to Pl.'s Mot. Summ. J. Ex. 13, May 5, 2015 Correspondence.)  On August 28, 2017, Plaintiff submitted an Amended Proof of Loss that was similarly rejected as non-conforming and unsubstantiated.  Allstate argues that "to this day" Plaintiff has never submitted a satisfactory proof of loss and therefore cannot claim entitlement to penalty interest under this statute.

Plaintiff does not devote more than one small paragraph to this claim in either her motion or her response to Defendant's motion. It appears that she deems this to be an issue "to be decided by the Court after the trier of fact finds for Plaintiff." (ECF No. 35, Pl.'s Resp. to Def.'s Mot. Summ. J. Ex. 11.) Apparently Plaintiff will not contest that Allstate complied with its obligations under Mich. Comp. Laws §§ 500.2006 (3), but Plaintiff does not believe that the amounts were "reasonably in dispute." This is an interesting response to Allstate's argument because as the first party insured, it does not appear that the "reasonably in dispute" limitation applies to Plaintiff's claim if she ultimately establishes that Allstate failed to pay her claim on a timely basis. *See, e.g. Nickola v. MIC Gen'l Ins. Co.*, 500 Mich. 115, 894 N.W.2d 552, 560 (2017) (observing that prior decisions of the Michigan Court of Appeals and Supreme Court "make clear that, under the plain language of MCL 500.2006(4), if the claimant is the insured and benefits are not paid on a timely basis, the claimant is entitled to 12% penalty interest per annum irrespective of whether the claim is reasonably in dispute) (citing *Yaldo v. North Pointe Ins. Co.*, 457 Mich. 341 (1998) and *Griswold Properties, LLC v. Lexington Ins. Co.*, 276 Mich. App. 551 (2007)). Allstate does not address Plaintiff's response to its 12% penalty interest argument at all in its Reply.

While Plaintiff apparently believes that the determinative issue is whether the claim is "reasonably in dispute," Allstate suggests in its motion that what the Court must decide in resolving the penalty interest issue "whether Plaintiff supplied a satisfactory proof of loss." (Def.'s Mot. 18, PgID 331.) Of course, "[t]he concepts of a claim 'reasonably in dispute' and 'satisfactory proof of loss' are separate and distinct for purposes of M.C.L. § 500.2006(4)." *Mathis v. Encompass Ins. Co.*, No. 06-cv-13837, 2008 WL 919934, at *4 (E.D. Mich. April 3, 2008) (citing *Medley v. Canady*, 126 Mich. App. 739, 743 (1983)). Neither party appears to want to address the issue raised by the other party – and it is not this Court's job to anticipate arguments and resolve issues that the parties themselves choose not to present or to ignore.

Regardless of Allstate's reasons for presenting the Court with this issue now and only in the context of its penalty interest argument, Allstate has failed to discuss (or even to cite a single case relevant to) the standard the Court should apply in determining what constitutes a "satisfactory proof of loss" under the penalty interest statute. *See, e.g., Great Lakes Geophysical, LLLP v. Travelers Prop. Cas. Ins. Co*., No. 13-cv-10830, 2013 WL 3850938, at * 6-9 (E.D. Mich. July 25, 2013) (noting that the term "satisfactory" is not defined in § 500.2006 and concluding that "the inquiry is guided by seven general principles [–] the standard is objective . . . the standard is

purposive . . . substantial performance is sufficient . . . satisfactory proof of loss is a necessary milestone [and ] not the end of the road . . . and does not require agreement among the parties as to the amount of the loss . . . and whether proof of loss was satisfactory is a question of fact") (internal quotation marks and citations omitted) (alterations added); *Stryker Corp. v. XL Ins. America Inc.*, No. 01-cv-157, 2008 WL 5235886, at *6 (W.D. Mich. Dec. 15, 2008) (suggesting that the "substantial compliance" standard applicable in the context of a contractual proof of loss provision also informs the standard in the penalty interest statute). "The Sixth Circuit [] recognizes . . . that Michigan law requires only 'substantial compliance' with the proof-of-loss requirement." *Shathaia v. Travelers Cas. & Ins. Co. of America*, 984 F. Supp. 2d 714, 726 (E.D. Mich. 2013) (quoting *Westfield Ins. Co. v. Appleton*, 132 F. App'x 567, 570 (6th Cir. 2005)). *See also Bowlers' Alley, Inc. v. Cincinnati Ins. Co.*, 108 F. Supp. 3d 543, 570 (E.D. Mich. 2015) ("[T]he parties agree that Michigan courts 'apply the rule of substantial compliance to cases involving the sufficiency of a proof of loss.'") (quoting *Wineholt v. Cincinnati Ins. Co.*, 179 F. Supp. 2d 742, 749 (W.D. Mich. 2001) and citing *Gibson v. Group Ins. Co.*, 142 Mich. App. 271, 275–76, 369 N.W.2d 484, 486 (1985)). "In determining whether there has been "substantial compliance" with a policy's proof of loss requirement, Michigan courts consider the three identified policy objectives of the requirement: (1) allowing the insurer an

opportunity to investigate the loss; (2) allowing the insurer to estimate its rights and liabilities; and (3) preventing fraud." *Shathaia*, 984 F. Supp. 2d at 726 (internal quotation marks and citations omitted).

Allstate argues that Plaintiff has failed to supply a satisfactory proof of loss and that for this reason she is not entitled to penalty interest under § 500.2006. However, Allstate does not cite or discuss the standards the Court should apply in assessing the adequacy of a proof of loss in the context of the penalty interest statute or how the facts of this case stack up against those standards. The Court declines to address the argument at this stage, both because it is not adequately briefed and argued and because "the question of whether an insured has substantially complied with a proof-of-loss requirement is [generally] a question of fact not to be decided on summary judgment." *Shathaia*, 984 F. Supp. 2d at 726 (alteration added). *See also Great Lakes Geophysical*, 2013 WL 3850938, at * 8 (interpreting the term "satisfactory proof of loss" in § 500.2006 and noting that it is "a question of fact not to be decided on summary [judgment]"). In any event, resolution of the Plaintiff's claim for 12% penalty interest under the Michigan Uniform Trade Practices Act is premature at this time as the issue of whether and to what extent Plaintiff will prevail on her claim that Allstate failed to timely pay her claim has yet to determined. *See Great Lakes Geophysical*, 2013 WL 3850938, at * 12 ("'If there was a failure to supply a

satisfactory proof of loss with regard to a portion of the claim, the court may still award penalty interest if there was a satisfactory proof of loss with respect to a separate portion of the claim.'") (quoting *Angott v. Chubb Grp. Ins.*, 270 Mich. App. 465, 717 N.W.2d 341, 354 (2006)).

### 5. Conclusions as to Allstate's Motion for Summary Judgment

When the facts are viewed in the light most favorable to the Plaintiff, there is evidence on which a reasonable juror could conclude that Plaintiff truthfully represented to Allstate that the boiler had been made operable and submitted the May 5, 2014 invoice from Strickly H/C in support of this representation, that Mr. Mitchell did make repairs on May 5, 2014 and that the boiler had been made operational. There is also evidence on which a reasonable juror could conclude that the boiler was operating during the months of January and February, 2015, as Plaintiff represented. There is also evidence on which a reasonable juror could conclude that Plaintiff suffered damage and loss to her personal property and dwelling, and that she endeavored to truthfully represent those damages to Allstate. Finally, Allstate's argument regarding the 12% interest penalty is inadequately presented and premature and is deferred until Plaintiff's entitlement to payment under the Policy has been determined. Accordingly, Allstate's motion for summary judgment is DENIED.

**B.      Plaintiff's Motion for Summary Judgment**

Plaintiff argues that her Policy was in effect at the time of the February 23, 2015 loss, that she at all times through the date of loss occupied the premises, that the Policy covers damages from burst or frozen pipes, that Plaintiff suffered damage as a result of such a covered event, and that she timely submitted a proper and truthful Proof of Loss, and therefore she is entitled to summary judgment. As discussed at length, *supra*, Allstate seeks to deny coverage on the claim as a whole based upon the alleged material misrepresentations made to Allstate by Plaintiff regarding the operability of the boiler, which Plaintiff allegedly knew to be material given the denial of her previous claim, and also submits that Plaintiff has made material misrepresentations in her Proof of Loss.

Viewing the facts discussed above in the light most favorable to Allstate, and particularly based on the Reports of Chad Peterson and the testimony of Maurice Wilson and Lonnie Mitchell (as discussed at length *supra*, the jury will be left to determine the credibility and weight to give Mr. Mitchell's testimony in light of the conflict between his deposition and his subsequently-filed Affidavit), there is a genuine issue of material fact as to when Mr. Mitchell repaired Plaintiff's boiler and whether Plaintiff knew, when she represented to Allstate that the boiler had been made operable and submitted the May 5, 2014 invoice from Strickly H/C in support of this

58

representation, that this representation was false. A reasonable juror could conclude that Plaintiff misrepresented the repair and condition of the boiler in an attempt to recover under the Policy even though Plaintiff knew the boiler had not been repaired and had not been working at the time of the February 2015 loss. A reasonable juror could conclude that Plaintiff made false statements and submitted an invoice dated May 5, 2014, as affirmative evidence and a representation that repairs were done on that date that were not.

"The fact that the parties have filed cross-motions for summary judgment does not mean, of course, that summary judgment for one side or the other is necessarily appropriate." *Parks*, 329 F.3d at 444. Plaintiff's motion for summary judgment is DENIED.

## C.     Defendant's Motion to Exclude the Testimony of Raymond Fair

Allstate complains that Raymond Fair, who testified that he did a general "walk through" of Plaintiff's home and did not take any photographs, has not personally inspected the items in the contents inventory to determine salvageability and submits that therefore his testimony should be excluded under Fed. R. Evid. 702 because it is based on speculation and conjecture and therefore lacks reliability. Plaintiff listed Fair as an "expert witness" on her witness list, and submitted a Fed. R. Civ. P. 26(a)(2)(C) Disclosure. This suggests that Plaintiff is designating Fair as a non-retained expert,

relieving him of the obligation of filing a full-blown expert report under Rule 26(a)(2)(B).  Allstate has not objected to this designation and also has not objected to the content of Fair's disclosure.  (ECF No. 31, Expert Witness Raymond Fair's Disclosure Pursuant to Rule 26(a)(2)(C).)

Allstate informed Plaintiff, as early as its first communication regarding the claim on March 12, 2015, of the detail required to be provided in Plaintiff's proof of loss.  (Def.'s Resp. Ex. 11, March 12, 2015 Correspondence.)  Allstate required, among other things, the following detail as to the claimed loss:

6.    The Actual Cash Value of the Property.

7.    The Whole Loss and Damage: Please provide a detailed estimate of the total Value of the property located on the premises and a detailed estimate of the damage sustained to the property as a result of the loss described above, the cost of repairing such damage described above and the cost of repairing such damage prepared by a person competent to prepare such estimates which, if requested, must be authenticated by bids from a general contractor and/or subcontractor competent to make such repairs; and

Please furnish a comprehensive inventory of the personal property damaged or destroyed by the risk of loss, state the price, place and date of purchase, present value (allowing for age, use and condition) and estimate the amount for repairs if the personal property can be repaired. Also, please attach any and all evidence of purchase in your possession, such as invoices, cancelled checks, receipts or other written documents. 9. After you have completed the Proof of Loss, sign the document before a notary and mail it to this office together with all of the documents, which you have relied upon to prepare your Proof of Loss.

(ECF No. 36, Def.'s Resp. to Pl.'s Mot. Summ. J. Ex. 11, March 12, 2015 Correspondence PgID 1202-03.)

The March 12, 2015 letter also quotes the relevant provisions from the Policy regarding an insured's duties when submitting a Proof of Loss, which include:

C)      Promptly separate the damaged and undamaged personal property, and furnish us with a detailed list of the damaged and undamaged property, showing the quantity, cost, actual cash value, and the amount of loss claimed.

D)      Give us all original bills, invoices and other vouchers, or certified copies, which we may reasonably request and keep an accurate record of any repair expenses.

G)      Within 60 days after the loss, give us a signed, Sworn Proof of Loss. This Statement should include the following information:

                    *               *               *

3.      The actual cash value and amount of loss of each item damaged or destroyed.

(March 12, 2015 Correspondence PgID 1203-04.)

Plaintiff submitted a Proof of Loss on April 3, 2015, which Allstate rejected as non-conforming on May 5, 2015, explaining the deficiencies, which included (1) the failure to state the Actual Cash Value of the claim and provide information in support, (2) stating an Amount Claimed that was vague and could not be verified with the information provided, and (3) failing to state the Whole Loss Amount, as explained in the March 5, 2012 letter.  (Def.'s Resp. to Pl.'s Mot. Summ. J. Ex. 13, May 5, 2015

Correspondence.) Two and a half years later, on August 28, 2017, Plaintiff submitted an Amended Proof of Loss, which Allstate again rejected for the same lack of specificity and documentation, including the failure to provide the Actual Cash Value and amount of loss for each item claimed as damaged or destroyed. (Def.'s Resp. to Pl.'s Mot. Summ. J. Ex. 15, Sept. 15, 2017 Correspondence.) This September 15, 2017 rejection of Plaintiff's August 28, 2017 Proof of Loss did not reference the fact that Allstate had denied Plaintiff's entire claim based on alleged fraud and misrepresentation on October 5, 2015, and in fact invited Plaintiff to submit yet another Proof of Loss with the proper detail to support her claimed damage amounts.

Plaintiff offers the testimony of Mr. Fair in support of her damage claim. In his deposition, Mr. Fair testified that Mr. Nicholas referred Plaintiff to Mr. Fair to act as her public adjuster. (Fair Dep. 10:23-11:9.) On February 24, 2015, Plaintiff signed a public adjusting contract appointing Mr. Fair as her public adjuster and on that date Mr. Fair recalled that he "probably did a walk through at that time to assess the damage," and probably sent vendors to the home thereafter to further assess the damage. (Fair Dep. 14:24-15:15.) Mr. Fair did not take any photos of the Property or of the damage to the Property or its contents. (Fair Dep. 15:22-24.) Mr. Fair prepared an initial contents estimate and stated that the $60,000 figure on the original Proof of Loss was a  based on his walk through and analysis of what appeared to be

damaged. (Fair Dep. 20:18-21:10.) Mr. Fair testified that normally with regard to contents he contacts vendors who come out and analyze the damage and inform him whether items are "totaled" or can be cleaned or fixed. Mr. Fair thought he "probably" contacted vendors to assess the items in Plaintiff's house but he wasn't sure and he did not provide any records of having done so. (Fair Dep. 22:4-23:23.) Mr. Fair did not have photographs of any of Plaintiff's allegedly damaged items but testified that he did not usually take photographs.

Plaintiff has submitted a mitigation report from Lennox Builders dated May 1, 2015, with an invoice for $40,000. (Fair Dep. 26:3-20; Pl.'s Resp. to Mot. to Exclude Fair Ex. 5, Lennox Brothers Mitigation Report.) Plaintiff also submits a structural damage estimate that was prepared by Darryl Motley, an independent contractor who did the building estimate for Mr. Fair. (Fair Dep. 53:22-55:22; Pl.'s Resp. to Mot. Exclude Ex. 2, 3/10/15 Estimate.) Mr. Motley's estimate "is based off of replacement cost for the damaged materials." (*Id*. at PgID 518.) Plaintiff also submits an electronic inventory for the electronics in Plaintiff's home, providing model and serial numbers for all electronics allegedly damaged in the home. (Pl.'s Resp. to Mot. Exclude Ex. 4, Feb. 25, 2015 Electronics Report.) Based on this information and these estimates, as explained by Mr. Fair in his deposition, Plaintiff's August 28, 2017 Amended Proof of Loss claims $125,073.28 for the building, $89,164.97 for the contents, and $25,500

for loss of use.  Thus, as discussed *supra*, contrary to Defendant's statements that Plaintiff has provided "no documentation" to substantiate the loss amounts, Plaintiff has in fact submitted *some* documentation.        Defendant argues that Mr. Fair cannot verify, as to any of the items on the contents inventory totaling $89,164.97 (Pl.'s Resp. to Mot. Exclude Ex. 6), whether the item was salvageable or damaged beyond repair:

> Q:    And it looks like the total of Exhibit 8 is $89,164.87?
> A:    Correct.
> Q:    Do you know if any of these items were salvageable?
> A:    I don't.
> Q:    That would be something that the vendors would know?
> A:    The vendors, yep.
> Q:    Do you know if a vendor inspected the contents identified in Exhibit 8 to determine if they were salvageable?
> A:    No.
> Q:    No, you don't know or no there wasn't one?
> A:    There was one called in the beginning, but the claim moved to SIU fairly fast.  So everything kind of erased once that happened.
> Q:    So as to your knowledge, there was no determination by a vendor that these particular items on Exhibit 8 were damaged by water at all –
> A:    No.
> Q:    Right?
> A:    Right. There's no – no.
> Q:    And you don't have specific personal knowledge to testify that each of the items on Exhibit 8 was damaged by water and needed to be replaced, right?
> A:    Say it again.
> Q:    Based on your personal knowledge, you're unable to say that each of these items on Exhibit 8 was damaged by water and needed to be replaced?
> A:    No, I guess you could say that.

Q:      And in the normal course of your handling of a water damage claim, you would have had the vendor look at the items, determine if they could be salvaged, right?

A:      Correct.

Q:      If they couldn't be salvaged, then you'd move to a determination of the replacement cost of each item with depreciation?

A:      Correct.

Q:      And that process did not happen here?

A:      Correct.

Q:      For whatever reason.

A:      Correct.

Q:      Do you know, if at all, the contents of the Annchester Road property were disposed of following the loss?

A:      I don't.

Q:      Do you know who disposed of the contents?

A:      I don't know, I don't know if they were, or they weren't.

                    *                    *                    *

Q:      So the depreciation amount of ten percent is speculation on you part?

A:      Correct.

Q:      And the source of the items, that's speculation on your part?

A:      Correct.

Q:      And the replacement cost is speculative to the extent that you're relying on speculation as to what the actual contents were and that they were unsalvageable? Is that fair?

A:      Correct.

Q:      So if you testify in this matter, you're not going to be able to produce any records to support the dollar amounts for replacement cost identified in Exhibit 8?

A:      Correct.

Q:      You don't have anything to produce regarding that, correct?

A:      Correct.

Q:      And same thing for depreciation, you don't have any photographs or other records that you can use to support your testimony as to depreciation?

A:      Correct.

(Fair Dep. 48:4-51:20.)

It does appear from Mr. Fair's testimony that he may not have done his most thorough job of calculating damages in this case, but he explains that this is due to the fact that the claim was tied up in investigation for such a long a period of time. Mr. Fair also testified that he personally interviewed the Plaintiff, visited the Property on at least five occasions, and consulted his own recollection of items he personally viewed in the home in creating the contents inventory that Plaintiff has submitted in support of her claim. Allstate has produced no contents evaluation of its own or expert testimony regarding the professional standards that govern the work of public adjusters in completing and submitting proofs of loss. While this line of questioning suggests some good material for cross-examination, the Court concludes that these shortcomings go to the weight of Mr. Fair's testimony and not its admissibility.

Moreover, any failure to establish salvageability and/or replacement value as to the contents inventory does not affect the estimates as to the other categories of damage. "The failure to supply any or adequate information as to certain line items stated in the proof of loss does not foreclose the plaintiff from recovering for other items that it did adequately substantiate." *Bowlers' Alley*, 108 F. Supp. 3d at 571. *See also Great Lakes Geophysical*, 2013 WL 3850938, at * 12 ("If there was a failure to supply a satisfactory proof of loss with regard to a portion of the claim, the court may still award penalty interest if there was a satisfactory proof of loss with respect to a

separate portion of the claim.").  The estimates from Motley, Lennox, and Restored Electronics were prepared at Mr. Fair's direction as part of his work as Plaintiff's public adjuster and Allstate has failed to establish that Mr. Fair will lack the foundation or expertise to testify regarding those estimates at trial. Mr. Fair will be subject to cross-examination as to those estimates.

Allstate informed Plaintiff in correspondence rejecting her Proof of Loss that under the Policy she was required to "provide a detailed estimate of the total value of the property located on the premises and a detailed estimate of the damage sustained to the property as a result of the loss . . . the cost of repairing such damage . . . and the cost of repairing such damage prepared by a person competent to prepare such estimates which, if requested, must be authenticated by bids from a general contractor and/or subcontractor competent to make such repairs." (Def.'s Resp. to Pl.'s Mot. Summ. J. Ex. 11, March 12, 2015 Correspondence.)  She claims she has done so to the best of her ability. Allstate has never cited the insufficiency of Plaintiff's Proof of Loss as a basis for denial of her claim as a whole and indeed has continued to invite Plaintiff to submit a conforming Proof of Loss.  (Def.'s Resp. to Pl.'s Mot. Summ. J. Ex. 15,  Sept. 15, 2017 Correspondence PgID 1213 and Ex. 16, Oct. 5, 2015 Denial Letter.)

At the hearing on the motion for summary judgment, Allstate backed away from its claims regarding the insufficiencies of Plaintiff's damages estimates and circled back to its underlying claim that none of the claimed damages constitute a covered loss because of the alleged fraud and misrepresentation and/or the failure to maintain proper heat or to properly winterize an unoccupied residence. If Allstate disputes Mr. Fair's expert opinion regarding the amounts that Plaintiff claims in her sworn Proof of Loss, it can do so at trial through the powerful tool of cross-examination.

The Court concludes that Allstate's challenges to Mr. Fair's testimony go to the weight of his testimony and not its admissibility. "[R]ejection of expert testimony is the exception, rather than the rule." *In re Scrap Metal*, 527 F.3d at 530. Testimony based on allegedly erroneous facts will generally be permitted "when there is some support for those facts in the record." *Id*. Allstate's motion to exclude Mr. Fair's testimony is DENIED.

## IV. CONCLUSION

For the foregoing reasons, the Court DENIES Defendant's motion for summary judgment, DENIES Plaintiff's motion for summary judgment and DENIES Defendant's motion to exclude the testimony of Raymond Fair. A pre-trial scheduling

order will issue.

IT IS SO ORDERED.

s/Paul D. Borman
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated:  April 20, 2018

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on April 20, 2018.

s/Deborah Tofil
Case Manager